HENRY K. SZKODA, Petitioner-Appellant, v. THE HUMAN RIGHTS COMMISSION *et al.*, Respondents-Appellees.

First District (3rd Division)   No. 1—96—3051

Opinion filed December 16, 1998.

Jonah Rosenberg, of Chicago, for appellant.

Robert S. Harlib, of Chicago, for appellee Robin Muhammad.

James E. Ryan, Attorney General, of Chicago (Barbara A. Preiner, Solicitor General, and Marcia L. McCormick, Assistant Attorney General, of counsel), for other appellees.

JUSTICE BURKE delivered the opinion of the court:

Petitioner Henry Szkoda appeals from an order of respondent Illinois Human Rights Commission (Commission) finding that Szkoda violated section 3—102(b) of the Illinois Human Rights Act (Act) (775

ILCS 5/3—102(B) (West 1996)) by discriminating against respondent Robin Muhammad on the basis of sex, and awarding Muhammad damages, attorney fees and assessing a civil penalty. Szkoda also appeals from the order denying his petition for rehearing of that order. On appeal, Szkoda contends: (1) the Commission's decision was against the manifest weight of the evidence because (a) the evidence did not support the Commission's determination of unlawful discrimination based on either a hostile environment or "a *quid pro quo* theory" and (b) Muhammad and respondent Illinois Department of Human Rights were collaterally estopped from denying that Muhammad was evicted for nonpayment of rent; (2) the damages awarded to Muhammad and the civil penalty were excessive and unsupported by the evidence; and (3) the Commission erred in awarding Muhammad attorney fees. For the reasons set forth below, we affirm in part, reverse in part and remand.

## BACKGROUND

On January 10, 1990, Muhammad filed a charge of unlawful discrimination with the Illinois Department of Human Rights (Department) against Szkoda, her landlord, alleging that he subjected her to "harassment and differential terms and conditions of *** tenancy because of her sex." The Department investigated the charges and, in turn, filed a complaint of a civil rights violation with the Commission, alleging that Szkoda discriminated against Muhammad on the basis of her sex in violation of section 3—102(B) of the Act. Szkoda answered, and the matter proceeded to an administrative hearing.

At the hearing, Muhammad testified that she lived in a garden apartment at 5041 South Dorchester Avenue in Chicago, along with her then-boyfriend Jeffrey Ewing, from June 1989 to February 1990. Szkoda was her landlord. Neither Muhammad nor Ewing had a written lease with Szkoda; instead, they had an oral agreement requiring a rental payment of $300 "[b]y the 5th of each month." According to Muhammad, she was never late with the rent.

In November 1989, Muhammad and Ewing began experiencing problems with the gas furnace in their apartment. Szkoda was informed and repeated attempts were made over the next several weeks to correct the problem; none succeeded. Finally, Szkoda brought Muhammad and Ewing a kerosene heater. Muhammad further testified that, on December 28, 1989, she was home "ill with the flu" when the flame inside the kerosene heater was extinguished. Unsure of how to relight the heater, Muhammad called Szkoda for help. He arrived and promptly relit the heater, after which "he watched it burn" for 30 minutes. Eventually, Muhammad, who was on the telephone with her

mother at that time, asked Szkoda if he was finished. When Szkoda said he was, she ended her conversation and walked him to the back door of her apartment. Muhammad was dressed only in her pajamas. As Szkoda passed by her on his way out, "he stopped and grabbed [her] in the back of [her] head and pulled [her] toward him and made [her] kiss him." Muhammad slapped him in the face and pushed him away, and Szkoda then ran out the back door of her apartment. Muhammad further stated that Szkoda was "[v]ery rough," and that she was "[d]isgusted and repulsed." She immediately washed her mouth off, after which she called her mother and then the police, explaining to both what had just occurred. Muhammad filed a battery complaint against Szkoda with the Chicago police department the following day.

Muhammad also testified that she had no further contact with Szkoda until January 3, 1990, when she attempted to pay the rent due for that month. Szkoda refused to accept the rent payment and told her to move. When she asked why, Szkoda replied, "You know why." Ewing also attempted to pay January's rent, but he too was refused. Shortly thereafter, Muhammad was served with a five-day eviction notice; she was evicted on February 4, 1990.

Muhammad further stated that following the December 28, 1989, incident, she suffered from insomnia, anxiety and stress, and that she remains "severely paranoid and nervous" whenever anyone enters her apartment to make repairs. She also suffered from "severe nightmares" and had been prescribed medication to counter the effects of her insomnia and anxiety. Muhammad denied ever threatening Szkoda with bodily harm if he refused to withdraw the five-day notice. Muhammad also denied receiving any subsequent notices of eviction proceedings.

Alice Thomas, also one of Szkoda's former tenants, testified that she lived in his apartment building from September 1987 to July 1989. In September 1987, Szkoda propositioned her while repairing a stove in her apartment. According to Thomas, Szkoda held her and tried to kiss her, and asked her if she wanted to "push," which Thomas understood as "have sex." Thomas also testified to two other similar incidents in which Szkoda touched her breasts and asked if she wanted to "push." Thomas spurned each of Szkoda's advances. Thomas was also served with a five-day notice. She, however, successfully challenged the eviction proceedings. Nevertheless, Thomas voluntarily left Szkoda's building following those proceedings.

Carol Bailey, who was a current tenant in Szkoda's apartment building, testified that she had been a tenant since 1988. In December 1988, she asked Szkoda to repair a light switch in her kitchen while she was away at work. When she returned that evening, she found

flowers on her kitchen table from Szkoda, who moments later knocked on her apartment door. Szkoda stated that he was looking for his jacket which he had left in Bailey's apartment earlier that day. Bailey gave Szkoda his jacket and the flowers, telling him she could not accept them. Szkoda apologized, saying "Me sorry. Me sorry. I thought you be me girlfriend." In February 1989, Szkoda visited Bailey's apartment to repair her toilet. When he finished, he called her into the bathroom, pointed to a piece of her lingerie and said, "Me like. Me like." Bailey said nothing in response, and left the bathroom. Bailey further testified that she was "shocked" by Szkoda's conduct; it made her "extremely uncomfortable," "scared" and "fearful." Bailey also stated that no other such conduct occurred thereafter.

Szkoda testified that on December 28, 1989, he was called by Muhammad to her apartment. When he arrived, she let him enter and directed him to the kerosene heater. He relit the heater and then watched to see if it would extinguish and relight itself as it should. He waited for approximately 30 minutes and determined that the heater was functioning properly. He told Muhammad this and then left. Szkoda denied any physical contact with Muhammad and, in fact, testified that it was he who had spurned her advances.

Szkoda further testified that Muhammad's rent was due on or before the first of each month and that she was always late. Nevertheless, he routinely excused her tardiness and withdrew the respective five-day notices when she "came *** crying, asking to stay in the apartment." According to Szkoda, January was no exception; Muhammad was again late with her rent. This time, however, Muhammad did not plead for leniency. Rather, Szkoda stated that when she approached him, she kept her left hand behind her back and told him, "You will be dead if you don't take this notice back." Szkoda also stated that Ewing assaulted him a few days later. No rental payment was ever made, and Szkoda refused to withdraw the five-day notice. Muhammad was evicted the following month. Szkoda further stated that Thomas was similarly delinquent in her rent, and that she was also evicted. Szkoda denied ever having any physical contact with Thomas or ever trying to kiss or touch her. Szkoda also specifically denied any other reason for Muhammad's eviction other than her failure to pay rent.

After the parties filed posthearing briefs, the administrative law judge issued her recommended liability determination. She made the following findings: on December 28, 1989, Muhammad asked Szkoda to repair the malfunctioning kerosene heater in her apartment; Szkoda made the necessary repairs; that as Szkoda was leaving Muhammad's apartment, he "stopped, roughly grabbed [Muhammad] by the

back of her head, pulled her toward him and made her kiss him on the mouth"; Muhammad slapped him and pushed him away; Muhammad subsequently filed a complaint with the Chicago police department alleging that Szkoda grabbed her and kissed her without consent; on January 3, 1990, Muhammad attempted to pay her rent for that month but was refused by Szkoda, who stated, "No, you keep it and move"; when Muhammad asked the reason, Szkoda replied, "You know why"; two days later, Muhammad was served with a five-day eviction notice; and Muhammad was evicted from Szkoda's apartment building the following month. She also found that Szkoda had previously made unwelcome sexual advances to other women in his apartment building but had "never attempted to touch or kiss [any of his] male tenants."

The administrative law judge concluded that Szkoda had discriminated against Muhammad "by subjecting her to unequal terms and conditions of her tenancy, and harassment because of her sex, in violation of [s]ection 3—102(B) of the Act." She recommended that the Commission adopt this finding and award Muhammad $13,060 for damages suffered as a result of Szkoda's unlawful conduct, assess a $10,000 civil penalty against Szkoda "to vindicate the public interest," and that Szkoda pay Muhammad's attorney fees and costs.

Prior to issuing a final decision, the administrative law judge who presided over the public hearing of Muhammad's case, left the Commission, and another administrative law judge subsequently rendered the final "Recommended Order and Decision" in the case, which included his ruling on a petition for attorney fees filed by Muhammad. In Muhammad's petition for attorney fees, she requested a total of $13,150.45, or treble the amount actually incurred. Szkoda objected. The administrative law judge found no justification for such trebling and recommended to the Commission that Muhammad only receive $4,368.75.

Szkoda filed exceptions to both administrative law judges' decisions. In his posthearing brief, Szkoda argued that Muhammad failed to prove that his reason for evicting her was pretextual and that Muhammad was collaterally estopped from asserting that her eviction was for reasons other than her failure to pay rent. Szkoda also argued that the damages and attorney fees awarded Muhammad should be reduced and that the assessment of a civil penalty was unreasonable.

On June 21, 1996, the Commission adopted the findings and decision of the administrative law judges and entered its "Order and Decision," finding that Szkoda discriminated against Muhammad on the basis of her sex in violation of section 3—102(B) of the Act. More specifically, Szkoda was found to have sexually harassed Muhammad by conditioning her tenancy upon acquiescence to his sexual requests.

The Commission awarded Muhammad $7,060 in economic damages, $6,000 for "humiliation, embarrassment and mental distress" and $4,368.75 in attorney fees, and also assessed Szkoda a $10,000 civil penalty. Thereafter, Szkoda petitioned for direct review of the Commission's decision to this court.

## MANIFEST WEIGHT OF THE EVIDENCE

Szkoda first contends that the Commission's decision was against the manifest weight of the evidence in that neither Muhammad nor the Department proved, by a preponderance of the evidence, that he "sexually harassed Muhammad under either a hostile environment or quid pro quo theory."

■ It is well settled that the Commission's findings and conclusions on questions of fact are deemed *prima facie* true and correct (735 ILCS 5/3—110 (West 1996)) and "shall be sustained unless the [reviewing] court determines that such findings are contrary to the manifest weight of the evidence" (775 ILCS 5/8—111(A)(2) (West 1996)). A decision of an administrative agency is contrary to the manifest weight of the evidence if no rational trier of fact, after viewing all of the evidence in a light most favorable to the agency, could have found as that agency did. *Chief Judge of the Circuit Court v. American Federation of State, County & Municipal Employees, Council 31*, 153 Ill. 2d 508, 514, 607 N.E.2d 182 (1992).

■ Section 1—102(A) of the Act declares Illinois to be against unlawful discrimination, including discrimination based upon sex in connection with real estate transactions. 775 ILCS 5/1—102(A) (West 1996). Section 3—102(B) of the Act further delineates the broad prohibitions of section 1—102(A), specifically providing:

> "It is a civil rights violation for an owner or any other person engaging in a real estate transaction, or for a real estate broker or salesman, because of *unlawful discrimination* or familial status, to
> ***
> [a]lter the terms, conditions or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith ***." (Emphasis added.) 775 ILCS 5/3—102(B) (West 1996).

Sexual harassment is a form of unlawful discrimination prohibited by section 3—102(B) of the Act. See *Old Ben Coal Co. v. Human Rights Comm'n*, 150 Ill. App. 3d 304, 309, 501 N.E.2d 920 (1986). However, no Illinois case has considered what constitutes a sexual harassment violation under section 3—102(B). Nor has such harassment been otherwise statutorily defined in section 3—102(B). Compare 775 ILCS 5/2—101(E) (West 1996) with 775 ILCS 5/3—101 (West 1996). Section 3—102(B) closely parallels section 3604(b) of the Fair Housing Amendments Act of 1988, which forbids discrimination against "any person

in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin." 42 U.S.C. § 3604(b) (1994). We therefore examine federal law relevant to this issue. *Trayling v. Board of Fire & Police Commissioners*, 273 Ill. App. 3d 1, 11, 653 N.E.2d 386 (1995); *Faulkner-King v. Department of Human Rights*, 225 Ill. App. 3d 784, 788, 587 N.E.2d 599 (1992).

As determined by several federal courts, section 3604(b) of the Fair Housing Amendments Act prohibits sexual harassment. *DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996); *Honce v. Vigil*, 1 F.3d 1085, 1088-90 (10th Cir. 1993); *Williams v. Poretsky Management, Inc.*, 955 F. Supp. 490, 494-96 (D. Md. 1996); *Beliveau v. Caras*, 873 F. Supp. 1393, 1396-97 (C.D. Cal. 1995); *New York ex rel. Abrams v. Merlino*, 694 F. Supp. 1101, 1104 (S.D.N.Y. 1988); *Shellhammer v. Lewallen*, Fair Housing-Fair Lending Rptr. par. 15,472, at 16,128-29 (W.D. Ohio 1983), *aff'd*, 770 F.2d 167 (6th Cir. 1985); see *Greiger v. Sheets*, 689 F. Supp. 835, 840 (N.D. Ill. 1988). Moreover, those same courts have held that, just as in employment-related sexual harassment actions, a violation of section 3604(b) may be established by demonstrating a "hostile environment" or that benefits were explicitly or implicitly conditioned upon sexual favors (*quid pro quo*). *Honce*, 1 F.3d at 1089-90; *Shellhammer*, Fair Housing-Fair Lending Rptr. par. 15,472, at 16,128.

In *Shellhammer*, the federal magistrate hearing the case defined the elements of a hostile housing environment sexual harassment claim under section 3604(b) of the Fair Housing Amendments Act as: (1) the plaintiff is a member of a protected group; (2) the plaintiff was "subjected to unwelcome and extensive sexual harassment, in the form of sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, which [were] not *** solicited or desired by the plaintiff, and which [were] viewed as undesirable or offensive"; (3) such harassment was based upon the plaintiff's sex; (4) such "harassment makes continued tenancy burdensome and significantly less desirable than if the harassment were not occurring"; and (5) "[i]f vicarious liability is asserted, the plaintiff must show that the owner knew or should have known about the particular harassment and [yet] failed to remediate the situation promptly." Fair Housing-Fair Lending Rptr. par. 15,472, at 16,128.

■ The *Shellhammer* court also identified five elements necessary to prove a *quid pro quo* sexual harassment claim under section 3604(b) as: (1) the plaintiff is a member of a protected group; (2) the plaintiff was subjected to "[a] demand for sexual favors, which [were] not *** solicited or desired by the tenant (or prospective tenant)"; (3) that such a request was based upon the plaintiff's sex; (4) "the plaintiff's

reaction to the request affected one or more tangible terms, conditions, or privileges of tenancy, in that she was denied or deprived of tenancy or a substantial benefit thereof as a result of her response to the landlord's demand for sexual favors"; and (5) "[i]f vicarious liability is asserted, the plaintiff must show that the owner knew or should have known about the particular harassment and [yet] failed to remediate the situation promptly." Fair Housing-Fair Lending Rptr. par. 15,472, at 16,129. We find that the elements of proof in the Fair Housing Amendments Act accord with the purpose of section 3—102(B) and are necessary to establish a sexual harassment violation of section 3—102(B) of the Act.

## A. Hostile Housing Environment Sexual Harassment

■ With regard to liability on the basis that Szkoda sexually harassed Muhammad in violation of section 3—102(B) of the Act by creating a hostile housing environment, he contends that evidence of a single instance of sexual harassment will not support such liability because a single instance does not establish "extensive" sexual harassment, as is required under that theory.

Both the Department's complaint of a civil rights violation and the evidence introduced at the administrative hearing make clear that Szkoda was not charged or tried under a theory of hostile housing environment sexual harassment. Even the Commission's decision ignores that theory. Accordingly, we decline to address this contention.[1]

## B. *Quid Pro Quo* Sexual Harassment

Szkoda also contends that no evidence was introduced establishing that he sexually harassed Muhammad by conditioning her tenancy upon her acquiescence in his sexual requests. Nor, according to Szkoda, was there any evidence that Muhammad was denied any privilege of her tenancy because she refused to accede to his sexual requests.

■ As with employment-related *quid pro quo* sexual harassment

---

[1]That notwithstanding, Szkoda's contention compels us to clarify the scope of section 3—102(B).

A single instance of sexual harassment may create a hostile housing environment in violation of section 3604(b) of the Fair Housing Amendments Act. *DiCenso*, 96 F.2d at 1009; *Beliveau*, 873 F. Supp. at 1398; see also *King v. Board of Regents of University of Wisconsin System*, 898 F.2d 533, 537 (7th Cir. 1990) (hostile working environment); *Williams*, 955 F. Supp. at 498. No less should be true with regard to section 3—102(B) of the Act. However, we express no opinion whether the facts of the present case would give rise to a hostile environment claim.

actions, housing-related *quid pro quo* sexual harassment actions are also resolved under a burden-shifting analysis. *Shellhammer*, Fair Housing-Fair Lending Rptr. par. 15,472, at 16,129 (adopting analysis set forth in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 258, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981), and *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 688, 93 S. Ct. 1817 (1973)). This analysis was explained by our supreme court in *Zaderaka v. Human Rights Comm'n*, 131 Ill. 2d 172, 545 N.E.2d 648 (1989), as follows:

"First, plaintiff must establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination. If a *prima facie* case is established, a rebuttable presumption arises that ·the employer unlawfully discriminated against plaintiff. Second, to rebut the presumption, the employer must articulate, *not prove* [citation], a legitimate, nondiscriminatory reason for its decision.

Finally, if the employer carries its burden of production, the presumption of unlawful discrimination falls and plaintiff must then prove by a preponderance of the evidence that the employer's articulated reason was not its true reason, but was instead a pretext for unlawful discrimination. This merges with plaintiff's ultimate burden of persuading the trier of fact that the employer unlawfully discriminated against plaintiff. [Citation.] This ultimate burden remains at all times with plaintiff." (Emphasis added.) *Zaderaka*, 131 Ill. 2d at 178-79.

■ Here, the Commission found that Muhammad established a *prima facie* case of *quid pro quo* sexual harassment in violation of section 3—102(B) of the Act based upon her testimony that she, without her consent, was grabbed and kissed by Szkoda, she slapped him and rebuffed his sexual advance and she was thereafter evicted. We agree. See *Shellhammer*, Fair Housing-Fair Lending Rptr. par. 15,472, at 16,129.

We disagree, however, with the Commission that Szkoda failed to rebut the presumption that he sexually harassed Muhammad. The Commission found that Muhammad had produced evidence of Szkoda's *direct* discrimination of her on the basis of her sex and, as such, the burden-shifting analysis of *Zaderaka* did not apply and that Szkoda "must do more than articulate a reason: he must provide evidence to support the reason." The Commission's rationale was based upon its interpretation of the *Shellhammer* decision as an example of a case where, in the Commission's words, there was "direct evidence [of a] *prima facie* case." However, the evidence Muhammad introduced at the hearing was *indirect* evidence of Szkoda's alleged discrimination, *i.e.*, the evidence was not that Szkoda directly threatened Muhammad with eviction unless she acquiesced to his advances but,

rather, after she rebuked him, he took actions, mainly eviction, based upon her rejection of his advances and her sex. The Commission therefore improperly shifted the burden of proof from Muhammad to Szkoda.

We further observe, contrary to the Commission's interpretation of *Shellhammer*, that the unambiguous language of *Shellhammer* demonstrates that it adopted the *McDonnell-Douglas* burden-shifting analysis that our supreme court adopted in *Zaderaka*. Based upon *Shellhammer*, Szkoda was not required to *prove* a legitimate, nondiscriminatory reason for Muhammad's eviction; he need only have *articulated* such a reason (*Zaderaka*, 131 Ill. 2d at 179), and he did so. Szkoda stated that he evicted Muhammad because she failed to pay rent for January. That reason was sufficient to rebut the presumption of sexual harassment. See *Shellhammer*, Fair Housing-Fair Lending Rptr. par. 15,472, at 16,129-30. The Commission's finding to the contrary was in error. Therefore, given that this is a case of first impression, we feel it is incumbent upon the Commission to remedy its error of interpretation of *Shellhammer*.

Notwithstanding the Commission's error, we cannot say the Commission's ultimate decision was contrary to the manifest weight of the evidence because the balance of Muhammad's testimony served to establish that Szkoda's proffered reason was a pretext for unlawful discrimination. Indeed, Muhammad testified that she and Ewing attempted to timely pay Szkoda the January rent but they were refused. The Commission found Muhammad credible; conversely, the Commission found Szkoda incredible. This court cannot substitute its judgment on the credibility of the witnesses (*Zaderaka*, 131 Ill. 2d at 180; *R.R. Donnelley & Sons Co. v. Human Rights Comm'n*, 219 Ill. App. 3d 789, 792, 579 N.E.2d 1144 (1991)), nor will we otherwise disturb the Commission's decision that Szkoda sexually harassed Muhammad in violation of section 3—102(b) of the Act.

■ We briefly note that Jeffrey Ewing never testified at the administrative hearing, although the Commission found as follows:

"[Szkoda] argued that he evicted Muhamm[a]d because of rent nonpayment. The [a]dministrative [l]aw [j]udge found this testimony to be incredible and instead believed the *testimonies of [Muhammad] and \*\*\* Ewing[,] who both testified that on separate occasions each of them attempted to pay [Szkoda] the January rent. Both [Muhammad] and \*\*\* Ewing testified that [Szkoda] refused the rent.*" (Emphasis added.)

Szkoda contends the Commission's finding that Ewing testified and that he did so credibly was in error. We agree; it plainly was, but we also believe that this was more of a misstatement by the Commis-

sion. We also find this error harmless in light of the fact that Muhammad also testified credibly as to the same events.

■ Szkoda further contends that "[t]he failure to produce Ewing should have given rise to the opposite conclusion that Ewing would not have supported Muhamm[a]d's testimony concerning these events." In support of his argument, Szkoda relies on *Simmons v. University of Chicago Hospitals & Clinics*, 162 Ill. 2d 1, 642 N.E.2d 107 (1994). However, *Simmons* involved a claim regarding whether the trial court erred in giving the jury a missing witness jury instruction. Here, no jury was involved. In any event, whether an adverse inference will be drawn against a party for failure to call a witness within its control is a determination committed to the sound discretion of the trier of fact. *Simmons*, 162 Ill. 2d at 7; see Illinois Pattern Jury Instructions, Civil, No. 5.01 (3d ed. 1995). Here, the administrative law judge apparently chose not to draw such an inference. We find no abuse of discretion in that determination, and therefore reject Szkoda's contention of error.

## COLLATERAL ESTOPPEL

Szkoda also contends that because Muhammad failed to appear and defend in the forcible entry and detainer action against her, both she and the Department were collaterally estopped from asserting that her eviction was for any reason other than failure to pay rent. Muhammad and the Department each argue, *inter alia*, that Szkoda has waived this contention by failing to raise it in a timely manner.

Szkoda first raised the affirmative defense of collateral estoppel in his posthearing brief. Both Muhammad and the Department argued that such an affirmative defense was waived, and the Commission agreed.

■ Because collateral estoppel is an affirmative defense, it must be properly pleaded or it is waived. *Estes Co. v. Employers Mutual Casualty Co.*, 79 Ill. 2d 228, 236, 402 N.E.2d 613 (1980); *County of Cook v. Priester*, 62 Ill. 2d 357, 371, 342 N.E.2d 41 (1976). Szkoda failed to plead collateral estoppel as a defense in his answer and, therefore, he waived the defense. *Parker v. Dameika*, 372 Ill. 235, 237-38, 23 N.E.2d 52 (1939); *Hagen v. Stone*, 277 Ill. App. 3d 388, 390-91, 660 N.E.2d 189 (1995); *Afshar, Inc. v. Condor Air Cargo, Inc.*, 250 Ill. App. 3d 229, 231, 621 N.E.2d 126 (1993); *Spagat v. Schak*, 130 Ill. App. 3d 130, 134, 473 N.E.2d 988 (1985).

## DAMAGES

Szkoda next contends that the damages awarded Muhammad were excessive, unreasonable and unsupported by the evidence.

"The amount of damages awarded to a prevailing complainant

under the Human Rights Act must be affirmed on review absent an abuse of discretion." *City of Chicago v. Human Rights Comm'n*, 264 Ill. App. 3d 982, 987, 637 N.E.2d 589 (1994); *Loyola University v. Human Rights Comm'n*, 149 Ill. App. 3d 8, 22, 500 N.E.2d 639 (1986).

## A. Economic Damages

Section 8B—104(B) of the Act provides that a successful complainant may recover "actual damages, as reasonably determined by the Commission, for injury or loss suffered." 775 ILCS 5/8B—104(B) (West 1996).

Muhammad testified that her monthly rent at Szkoda's South Dorchester Avenue apartment was $300 and that, following her eviction, she moved to a smaller apartment on South Coles Avenue, where she paid $425 per month in rent for six months before moving to 5044 South Woodlawn Avenue, where her monthly rent was $535. Muhammad was awarded $7,060 in economic damages, which included $200 for moving expenses from her apartment in Szkoda's building to her South Coles Avenue apartment, $750 for increased rent during her stay in that apartment, and $6,110 for increased rent at 5044 South Woodlawn Avenue.

■ Szkoda raises several contentions with regard to Muhammad's award for economic damages. However, each such contention has been waived for purposes of direct review, as none were raised during the administrative proceedings. *Raintree Health Care Center v. Illinois Human Rights Comm'n*, 173 Ill. 2d 469, 493, 672 N.E.2d 1136 (1996).

## B. Noneconomic Damages

The "actual damages" provision of section 8B—104(B) of the Act also includes damages for emotional harm and mental suffering. *Arlington Park Race Track Corp. v. Human Rights Comm'n*, 199 Ill. App. 3d 698, 709, 557 N.E.2d 517 (1990); see *ISS International Service System, Inc. v. Human Rights Comm'n*, 272 Ill. App. 3d 969, 979, 651 N.E.2d 592 (1995) (construing identical section 8A—104(B) of the Act); *Village of Bellwood Board of Fire & Police Commissioners v. Human Rights Comm'n*, 184 Ill. App. 3d 339, 354-55, 541 N.E.2d 1248 (1989).

Muhammad was awarded $6,000 for "humiliation, embarrassment and mental distress." Szkoda contends the award was excessive because "[o]nly a single, isolated event was involved," Muhammad did not testify to suffering humiliation or embarrassment, nor was there any evidence he "intentionally violated any law."

■ It is clear from Muhammad's testimony that she sought damages for humiliation suffered as a result of Szkoda's conduct. Szkoda's

contention to the contrary is simply erroneous. However, the same cannot be said with regard to those damages awarded for embarrassment; there was no such evidence upon which to base such an award. Moreover, Muhammad expressly and unequivocally denied that she was seeking such damages. The award was therefore in error. See *Hanaman v. Davis*, 20 Ill. App. 2d 111, 114-15, 155 N.E.2d 344 (1959); *Chrysler v. Darnall*, 238 Ill. App. 3d 673, 680, 606 N.E.2d 553 (1992); *Poeta v. Sheridan Point Shopping Plaza Partnership*, 195 Ill. App. 3d 852, 858, 552 N.E.2d 1248 (1990). The Commission's damage award for "humiliation, embarrassment and mental distress" is accordingly reversed, and this matter is remanded for a recomputation of Muhammad's noneconomic damages, with directions that the Commission shall limit its consideration to the evidence before it.

## C. Civil Penalty

Szkoda next contends that the Commission's assessment of the maximum civil penalty was "unreasonable and overly harsh." According to Szkoda, "absent a showing that [his] actions were in wilful or knowing disregard of the law, *** a civil penalty under the Act is not appropriate."

■ The assessment of a civil penalty is a matter within the discretion of the Commission and we will not disturb that determination absent an abuse of that discretion. *City of Chicago v. Human Rights Comm'n*, 264 Ill. App. 3d 982, 987, 637 N.E.2d 589 (1994). Section 8B—104(C) of the Act provides for the assessment of a civil penalty to vindicate the public interest in an amount not to exceed $10,000. 775 ILCS 5/8B—104(C) (West 1996). It is the duty of a court to interpret statutory language; it is not the duty of a court to annex new provisions or conditions. *People v. Boreman*, 401 Ill. 566, 572, 82 N.E.2d 459 (1948); *People v. Pierce*, 80 Ill. App. 3d 514, 516, 400 N.E.2d 62 (1980). Section 8B—104(C) does not require a wilful or knowing disregard of the law before a civil penalty may be assessed. 775 ILCS 5/8B—104(C) (West 1996). Rather, the only precondition to such a penalty is the existence of a civil rights violation. 775 ILCS 5/8B—104 (West 1996). To require a wilful or knowing violation of the law before a civil penalty pursuant to section 8B—104(C) of the Act may be assessed would be to annex a new condition onto that statutory section, which we decline to do.

■ While we decline to accept Szkoda's argument with respect to a wilful or knowing violation, we find that the Commission abused its discretion in imposing a $10,000 civil penalty. The legislature provided for $10,000 to be the maximum amount recoverable as a civil penalty to "vindicate the public interest." The parties do not cite to any Il-

linois case law addressing the imposition of a civil penalty pursuant to section 8B—104(C), and our research reveals none. However, section 3614(d)(1)(C) of the Fair Housing Amendments Act of 1988 (42 U.S.C. § 3614(d)(1)(C) (1994)), which permits the imposition of a civil penalty to "vindicate the public interest" after a finding of unlawful discrimination in housing, is similar to section 8B—104(C). See *Smith & Lee Associates v. City of Taylor*, 102 F.3d 781, 798 (6th Cir. 1996) ("courts should consider the nature of [a] defendant's conduct when deciding whether a fine is warranted"). In addressing the issue of imposing a penalty pursuant to section 3614(d)(1)(C), the *Smith* court stated:

> " 'The court may *** assess civil penalties against a defendant up to a maximum of $50,000 for a first violation and $100,000 for any subsequent violations. *** [T]hese are maximum, not minimum, penalties, and are not automatic in every case. When determining the amount of a penalty against a defendant the court should consider the nature and circumstances of the violation, the degree of culpability, any history of prior violations, the financial circumstances of that defendant and the goal of deterrence, and other matters as justice may require.' " *Smith*, 102 F.3d at 798, quoting House Committee on the Judiciary, Fair Housing Amendments Act of 1988, H.R. Rep. No. 100—711, at 40 (1988), *reprinted* in 1988 U.S.C.C.A.N. 2173, 2201.

Section 3612(g)(3) of the Fair Housing Amendments Act of 1988 (42 U.S.C. § 3612(g)(3) (1994)) also allows for the imposition of a civil penalty to "vindicate the public interest" after a finding of unlawful discrimination in housing. See *Krueger v. Cuomo*, 115 F.3d 487, 493 (7th Cir. 1997) (finding considerations such as "financial resources, as well as the seriousness of *** [the] misconduct and the need to deter *** [the wrongdoer] and other landlords from repeating the harassment" are proper in the assessment of a civil penalty); see also *Morgan v. Secretary of Housing & Urban Development*, 985 F.2d 1451, 1461 (10th Cir. 1993) ("the public interest would not be well served by blanket imposition of penalties without regard to individual and personal conduct and competent proof, including mitigating factors"). New York case law also supports the application of "a principle of proportionality" in the imposition of a civil penalty to ensure that the penalty is in proportion to the seriousness of the conduct. See *In re Application of 119-121 East 97th Street Corp. v. New York City Comm'n on Human Rights*, 220 A.D.2d 79, 88, 642 N.Y.S.2d 638, 644 (1996).[2]

In the present case, the Commission's imposition of the maximum

---

[2]We believe that, unlike civil penalties imposed pursuant to the Illinois Environmental Protection Act (415 ILCS 5/42 (West 1992)), which the

allowable penalty, given Szkoda's actions, which while indefensible, leaves nothing for the Commission, at a later time, to use as a penalty for violations of even greater magnitude and longer duration. See generally *Morgan*, 985 F.2d at 1461; see also *119-121 East 97th Street*, 220 A.D.2d at 88, 642 N.Y.S.2d at 644. By giving the maximum penalty in the instant case, the Commission made a determination that Szkoda's conduct was on a relative scale of the worst caliber. We believe the evidence does not support this extreme proposition. The events complained of were not ongoing or repeated over an extended period of time, and this was Szkoda's first violation. Although we are convinced that Szkoda conditioned Muhammad's tenancy on her granting of sexual favors, we are not convinced that the public interest in deterrence or penalizing Szkoda's unlawful conduct would be well served "by [the] blanket imposition of penalties without regard to individual and personal conduct and competent proof, including mitigating factors." *Morgan*, 985 F.2d at 1461; see also *Shellhammer*, Fair Housing-Fair Lending Rptr. par. 15,472, at 16,128 (holding that two or three requests of a sexual nature during three or four months does "not amount to the pervasive and persistent conduct which is a predicate to finding that the sexual harassment created a burdensome situation which caused the tenancy to be significantly less desirable than it would have been had the harassment not occurred"). Accordingly, we reverse the Commission's decision as to the amount of the civil penalty, and remand this cause with directions that the Commission recompute the civil penalty in an amount not inconsistent with the views expressed herein.

## ATTORNEY FEES

Section 8B—104(D) of the Act provides for an award of attorney fees to a prevailing party. 775 ILCS 5/8B—104(D) (West 1996). Here, Muhammad petitioned for attorney fees following the hearing. A

---

legislature intended "to provide a method to aid the enforcement of the Act" (see *Park Crematory, Inc. v. Pollution Control Board*, 264 Ill. App. 3d 498, 502, 637 N.E.2d 520 (1994)), the penalty in this case is more akin to a punishment to "vindicate the public interest" as in *Smith, Morgan, Krueger*, and *119-121 East 97th Street*. However, we cannot discern any reason, nor has the Commission provided one to us, to depart from the Illinois rule that "the fine must be 'commensurate with the seriousness of the infraction' " (*Park Crematory*, 264 Ill. App. 3d at 502, quoting *Trilla Steel Drum Corp. v. Pollution Control Board*, 180 Ill. App. 3d 1010, 1013, 536 N.E.2d 788 (1989)). Such a "principle of proportionality," for the imposition of civil penalties in cases similar to the case at bar, also finds support in New York. *119-121 East 97th Street*, 220 A.D.2d at 88, 642 N.Y.S.2d at 644.

detailed affidavit was among the attachments included within that petition. Szkoda contends, however, that he received no such affidavit, nor any affidavit "concerning hours spent in this case." Accordingly, he maintains that this matter should be remanded so that he may be served with a complete petition. Szkoda also argues that the failure to hold an evidentiary hearing on Muhammad's petition for attorney fees was error, as such is required.

█ We find Szkoda's arguments without merit. Muhammad's petition for attorney fees bore a certification that all parties of record were properly served. Szkoda now attempts to challenge that certification on the basis of unsworn allegations of incompleteness. He may not do so. A proof of service certified pursuant to section 1—109 of the Code of Civil Procedure, as here, "may be used in the same manner and with the same force and effect as though subscribed and sworn to under oath." 735 ILCS 5/1—109 (West 1996). Accordingly, an unsworn allegation of incompleteness, as by Szkoda here, will not suffice to rebut such a proof of service. *Cf. Conroy v. Andeck Resources '81 Year-End Ltd.*, 137 Ill. App. 3d 375, 390, 484 N.E.2d 525 (1985); *Kutner v. DeMassa*, 96 Ill. App. 3d 243, 248, 421 N.E.2d 231 (1981). Nor can we say the Commission erred in failing to hold an evidentiary hearing on Muhammad's petition. Such a hearing is entirely discretionary with the Commission (*Raintree Health Care Center*, 173 Ill. 2d at 495), and we perceive no abuse of that discretion.

## CONCLUSION

For the reasons stated, we affirm the Commission's decision as to liability, economic damages, and attorney fees. However, we reverse the Commission's decision as to noneconomic damages and its assessment of the maximum civil penalty, and remand this cause to the Commission for a recomputation of the noneconomic damages and civil penalty in accordance with our directions.

Affirmed in part, reversed in part and remanded with directions.

GORDON and CAHILL, JJ., concur.