2020 IL App (1st) 190944-U
No. 1-19-0944
Order filed February 24, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| ANGELA PAYNE, | ) | Petition for Direct |
| | ) | Administrative Review of a |
| Petitioner-Appellant, | ) | Decision of the Illinois Human |
| | ) | Rights Commission |
| v. | ) | |
| | ) | |
| THE ILLINOIS HUMAN RIGHTS COMMISSION, THE | ) | No. 2016 CH 2437 |
| ILLINOIS DEPARTMENT OF HUMAN RIGHTS, | ) | |
| ALEC LEDIC, and PRO INVEST REALTY LLC, | ) | |
| | ) | |
| Respondents-Appellees. | ) | |
| | ) | |

_____

PRESIDING JUSTICE GRIFFIN delivered the judgment of the court.
Justices Hyman and Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The Illinois Human Rights Commission did not abuse its discretion in sustaining the Illinois Department of Human Rights' dismissal of petitioner's discrimination charge.

¶ 2    Petitioner Angela Payne appeals from an order of respondent Illinois Human Rights Commission (Commission) sustaining the dismissal by respondent Illinois Department of Human Rights (Department) of Payne's discrimination charge pursuant to the Illinois Human Rights Act

("Act") (775 ILCS 5/1-101, *et seq.* (West 2014)). This is a direct appeal from the Commission's decision to this court pursuant to section 5/8-111(B) of the Act (775 ILCS 5/8-111(B) (West 2014).

¶ 3    At relevant times, Payne rented an apartment unit on East 70th Place in Chicago, which property was managed by respondents Alec Ledic and Pro Invest Realty, LLC (Pro Invest). On April 29, 2016, Payne filed a "Housing Discrimination Complaint" (the complaint) naming both Ledic and Pro Invest as respondents. The complaint alleged that Payne was subjected to "[d]iscriminatory terms, conditions, privileges, or services and facilities" because of her sex (Count A) and that she was subject to retaliation (Count B).

¶ 4    Payne alleged that "since June 11, 2015 and continuing, she has been subjected to sexual harassment from a subcontractor hired to work in the building" but her "complaints of the harassment to management have gone unaddressed." In November 2015, she was served with a notice that her rent would increase upon the renewal of her lease; she alleged that the "rate increase is because she complained about the sexual harassment." Payne stated that she "believes that she is being subject to differential terms and conditions as a tenant because of her sex and in retaliation for complaining about sexual harassment."

¶ 5    The Department conducted an investigation, including multiple interviews with Payne and Ledic. On November 29, 2016 the Department issued a "Final Investigative Report" that summarized several interviews conducted by the Department's investigator, as well as documents submitted by Ledic to the investigator.

¶ 6    The report reflects that, in a May 3, 2016 interview, Payne stated that she was sexually harassed by Jorge Cermon, a subcontractor hired by Ledic to work at the apartment building. She stated that during a casual conversation with Cermon, she asked him if he wanted some wine.

Cermon "at first said he wasn't sure, but then he said ok to the glass of wine as long as [Payne] would remember what she did the next day." Cermon "started talking about his interactions with other females and how this has happened to him with other females." Payne tried to change the subject of the conversation, but Cermon "kept talking about sex." Payne had no other verbal interactions with Cermon. However, she stated that "when she would see [Cermon] on the property he kept doing 'elevator' eyes on her." Payne reported Cermon's conduct to Ledic, but he told her it was "nonsense." Sometime after Payne complained to Ledic, Cermon "came to her door after hours knocking on her door" but she did not answer. She did not report that incident to Ledic. Payne stated that she had been paying $625 per month in rent. In November 2015, she received a new lease from Ledic, who "now wanted $700 a month in rent."

¶ 7    When Ledic was interviewed in November 2016, he acknowledged that Payne had reported to him that Cermon was sexually harassing her. According to the investigative report, Payne "informed him that she offered [Cermon] a glass of wine and that after a few glasses of wine the conversation turned sexual in nature." Payne did not provide Ledic with any other details of the conversation. Ledic told Payne that he would speak to Cermon, and he advised Cermon to stay away from her.

¶ 8    Ledic acknowledged that in November 2015 he sent Payne an email notifying her that with her new lease, rent would increase to $700 per month. According to Ledic, Payne responded by stating she had "financial issues" and asked if she could pay a lower amount of rent. Ledic emailed Payne "asking what she thought was fair and she responded with $675"; Ledic agreed, and Payne

then signed a lease agreement. Ledic provided the Department's investigator with the referenced email correspondence, as well as the signed lease agreement.[1]

¶ 9    Ledic additionally told the investigator that that he was marketing one-bedroom apartments in the building for $700 per month. He stated that there are 22 one-bedroom units at the property; six of them are vacant, "12 of the apartments are paying $675 or higher in monthly rent and 4 apartments are paying less than $675 a month in rent." Ledic provided a "comparative rents" document reflecting this information. Ledic stated that the four tenants paying less than $675 in rent "occupied the property prior to [Pro Invest Realty] purchasing the property and they are on month-to-month lease agreements."

¶ 10    Ledic further stated that, when Pro Invest sold the property in March 2016, Payne sent him an email in which she thanked him, "apologized for any misunderstandings and wished him well." In the same email, Payne "asked him to have a drink to talk about the good old days." Ledic provided a copy of that email to the investigator.

¶ 11    In a subsequent interview with the investigator on November 18, 2016, Payne "stated that the sexual conversation with [Cermon] may have been mutual." She stated, "that when a male speaks about his sexual encounters with a female, but the female says stop and the male doesn't stop this is sexual harassment." Payne "d[id] not recall if she told [Cermon] to stop talking * * * about his sexual encounters" but stated that she ignored what he was saying and changed the subject. Payne stated that "by [Cermon] coming over and knocking on her door after hours, this was [Cermon's] way of imposing himself on her and this is a form of sexual harassment." Payne

---

[1] The documents provided by Ledic to the Department's investigator are not in the record on appeal but are summarized in the Department's investigative report.

also told the investigator that Ledic began "to hit on her sexually to prove that [Cermon] was innocent and to help prove that she was the one harassing them." However, she "did not explain in what ways Ledic was hitting on her or provide any details as to how this was sexual harassment."

¶ 12    Payne acknowledged that she was paying $675 per month in rent. She stated that only new tenants were paying $700 in rent. She claimed that "all of the old tenants' rents were not raised, [and] only her rent was raised."

¶ 13    The Department's investigator also interviewed Cermon, who denied that he was Ledic's employee but stated that he worked for Ledic on an as-needed basis. Cermon agreed that Payne had "offer[ed] him wine while he was painting her apartment" but denied that he had wine with her. Cermon denied having any conversations of a sexual nature with Payne. He stated that he had knocked on her door for service calls, but never at night.

¶ 14    On November 29, 2016, the Department issued a "Determination of Lack of Substantial Evidence" with respect to Payne's complaint. Regarding Count A, the Department found: "The investigation did not reveal and [Payne] did not provide any evidence that the alleged conduct by [Cermon], even if true, was egregious or sexual in nature." Further, "the investigation did not reveal and [Payne] did not show a nexus between the alleged discriminatory actions and [Payne]'s sex." With respect to Count B, the Department found that, although Ledic requested a rent increase in November 2015, "the investigation has not revealed any retaliatory nexus or raised an inference of retaliatory motivation." The Department also noted that "comparative documentation * * * indicates that other tenants are paying the same o[r] higher rent than" petitioner.

¶ 15    On January 19, 2017, the Department dismissed Counts A and B for lack of substantial evidence. On January 27, 2017, Payne filed a request for review with the Commission.

¶ 16    In an order dated April 30, 2019, the Commission sustained the Department's dismissal, concluding that the Department properly dismissed both Counts A and B for lack of substantial evidence. First, with respect to Count A, the Commission found the evidence was insufficient to establish a *prima facie* case of quid pro quo sexual harassment:

> "[Payne] did not establish that she was subject to a demand for sexual favors because according to her, she invited Jorge Cermon into her apartment for a glass of wine. She stated but he denied that the conversation turned sexual. [Payne] did not demonstrate that her denial of his request affected one or more terms of the tenancy because Pro Invest reduced the rent from $700.00 to $675.00 at her request. She did not establish vicarious liability because the [sic] Pro Invest took remedial actions by informing Cermon to stay away from [Payne]."

¶ 17    With respect to Count B, the Commission found that Payne failed to establish a *prima facie* case "that Pro Invest retaliated against her for complaining that Cermon harassed her by raising the rent." The Commission reasoned that the length of time between her June 2015 complaint about Cermon and the November 2015 rental increase was "too long to establish a connection between the protected activity and Pro Invest's actions." Further, the Commission found that Pro Invest "established that it raised the rent of several tenants more than it raised [Payne's] rent" and noted that Payne "requested and Pro Invest agreed to lower her rent to $675.00 per month." The Commission thus sustained the Department's dismissal of both counts of Payne's charge.

¶ 18    On May 8, 2019, Payne filed a timely petition for direct review of the Commission's decision in this court. See Ill. S. Ct. R. 335(a) (eff. July 1, 2017).

¶ 19    On appeal, Payne argues in her *prose* brief[2] that "[t]he district agencies erroneously granted summary judgment in Respondents' favor because it found Respondents did not have actual or constructive notice of the sexual harassment." She asserts that she "established a prima facie case of sexual harassment discrimination" under the Illinois Human Rights Act. She contends that "[r]espondents had actual knowledge, or at least constructive knowledge of the sexual harassment, but did nothing about it." Payne also argues that she "stated a prima facie case of reprisal" under the Act. She contends that "multiple issues of material fact remain as to whether [she] was subject to sexual harassment" and retaliation, such that a "reasonable factfinder could find in [her] favor on both counts of discrimination" under the Act.  She requests that we "vacate the agency court's summary judgment in its entirety and remand this case for trial."

¶ 20    As an initial matter, we observe that Payne's *pro se* brief fails to comply with certain requirements of Illinois Supreme Court Rule 341, which governs the content of appellate briefs. For example, the "statement of facts" portion of her brief contains multiple violations of Rule 341(h)(6) (eff. May 25, 2018) (providing that the statement of facts "shall contain the facts necessary to understanding of the case, stated accurately and fairly without argument or comment, and with appropriate references to the pages of the record on appeal"). Payne fails to include *any* record citations. Her statement of facts also violates Rule 341(h)(6) in that it contains improper argument, including her contention that the Department's investigator "created evidence" and that the report contains "misinformation" and "alternative facts."

¶ 21    The "argument" portion of Payne's brief similarly contains no citations to the record, in violation of Rule 341(h)(7) (eff. May 25, 2018) (argument shall contain "citation of the authorities

_____

[2] Payne did not file a reply brief.

and the pages of the record relied on"). We further note that many of the legal authorities she cites are simply irrelevant to the procedural posture of this case; for instance, she cites cases describing the standard of review upon entry of summary judgment. The failure to state the applicable standard of review further constitutes a violation of Rule 341(h)(3)'s requirement that "the appellant must include a concise statement of the applicable standard of review for each issue." Ill. S. Ct. R. 341(h)(3) (eff. May 25, 2018).

¶ 22    *Pro se* appellants are "not entitled to more lenient treatment than attorneys" but "must comply with the same rules and are held to the same standards as licensed attorneys." *Holzrichter v. Yorath*, 2013 IL App (1st) 110287, ¶ 78. "This court has the discretion to strike an appellant's brief and dismiss an appeal for failure to comply with Rule 341. *Id.* ¶ 77. However, striking an appellate brief "is a harsh sanction and is appropriate only when the violation of procedural rules hinder our review." *Hall v. Naper Gold Hospitality, LLC*, 2012 IL App (2d) 111151, ¶ 15; see also *Twardowski v. Holiday Hospitality Fundraising*, 321 Ill. App. 3d 509, 511 (2001) (choosing to reach the merits where "meaningful review is not precluded" by deficiencies in appellant's brief). Despite the deficiencies in Payne's brief, we choose to reach the merits because meaningful review is not precluded; it is clear that she challenges the Commission's final order and we have the benefit of the Commission's cogent brief to assist in our review.

¶ 23    A case under the Act is commenced by an aggrieved party's written charge filed with the Department. 775 ILCS 5/7A-102(A)(1) (West 2016). The Department then investigates to determine whether there is substantial evidence that the alleged violation has been committed. 775 ILCS 5/7A-102(C)(4), (D)(2) (West 2016). "Substantial evidence is evidence which a reasonable mind accepts as sufficient to support a particular conclusion and which consists of more than a

mere scintilla but may be somewhat less than a preponderance." 775 ILCS 5/7A-102(D)(2) (West 2016). If the Department determines that there is no substantial evidence, the charge shall be dismissed. 775 ILCS 5/7A-102(D)(3) (West 2016). The charging party may then file a request for the Commission to review the dismissal. *Id.*

¶ 24 The Commission has jurisdiction to hear and determine requests for review of decisions of the Department to dismiss a charge. 775 ILCS 5/8-103(A) (West 2016). Upon such request, the "Commission may consider the Department's report, any argument and supplemental evidence timely submitted, and the results of any additional investigation conducted by the Department in response to the request." 775 ILCS 5/8-103(B) (West 2016). A complainant may obtain judicial review of the Commission's final order by filing a petition for review in the Appellate Court within 35 days from the date that a copy of the Commission's decision was served upon the complainant. 775 ILCS 5/8-111(B)(1) (West 2016).

¶ 25 In reviewing the Commission's final order sustaining the dismissal of a discrimination charge for lack of substantial evidence, this court applies an abuse of discretion standard. *Young v. Illinois Human Rights Comm'n*, 2012 IL App (1st) 112204, ¶¶ 32-33. "Under the abuse of discretion standard, the court should not disturb the Commission's decision unless it is arbitrary or capricious. [Citation.] A decision is arbitrary or capricious if it contravenes legislative intent, fails to consider a critical aspect of the matter, or offer[s] an explanation so implausible that it cannot be regarded as the result of an exercise of the agency's expertise. [Citation.]" *Id.* ¶ 33. Our court "may not reweigh the evidence or substitute its judgment for that of the Commission. [Citation.]" *Id.* An abuse of discretion will be found where no reasonable person could agree with the Commission's decision. *Id.*

¶ 26    We will thus consider whether the Commission's decision to sustain the dismissal of Payne's charge constituted an abuse of discretion. We will separately discuss the Commission's decision with respect to both Count A (sexual harassment) and Count B (retaliation).

¶ 27    The Act declares that it is the public policy of the state to secure freedom for individuals from discrimination on the basis of sex, in connection with matters including "real estate transactions." 775 ILCS 5/1-102(A) (West 2016). Under section 3-102 of the Act, it is a civil rights violation for a person, because of "unlawful discrimination," to "[a]lter the terms, conditions or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith." 775 ILCS 5/3-102(B) (West 2016). "Unlawful discrimination" is defined to include discrimination against a person because of his or her sex. 775 ILCS 5/1-103(Q) (West 2016).

¶ 28    "Sexual harassment is a form of unlawful discrimination prohibited by section 3-102(B) of the Act. [Citation.]" *Szkoda v. Illinois Human Rights Comm'n*, 302 Ill. App. 3d 532, 539 (1998). In *Szkoda*, our court observed that no Illinois case had yet considered what constitutes a sexual harassment violation under section 3-102(B), and that sexual harassment was not statutorily defined in the Act. *Id.* However, our court noted that section 3-102(B) "closely parallels section 3604(b) of the Fair Housing Amendments Act of 1988, which forbids discrimination against 'any person in the terms, conditions, or privileges of sale or rental of a dwelling * * * because of race, color, religion, sex, or national origin.' " *Id.* at 539-40 (quoting 42 U.S.C. § 3604(b) (1994)). Our court noted that, under federal case law interpreting that statute, a violation could be established either by demonstrating a "hostile environment" or that "benefits were explicitly or implicitly conditioned upon sexual favors (*quid pro quo*)." *Szkoda*, 302 Ill. App. 3d at 540.

¶ 29   In *Szkoda*, our court held that "the elements of proof in the [federal] Fair Housing Amendment Act accord with the purpose of section 3-102(B) and are necessary to establish a sexual harassment violation of section 3-102(B) of the Act." *Id.* at 541. Thus, our court held that the elements of a "hostile environment" and *quid pro quo* claim under the federal Fair Housing Amendments Act were also applicable to a sexual harassment claim under section 3-102(B) of the Act. *Id.* at 540-41. Specifically, with respect to a "hostile environment" sexual harassment claim, our court in *Szkoda* adopted the following elements: "(1) the plaintiff is a member of a protected group; (2) the plaintiff was 'subjected to unwelcome and extensive sexual harassment, in the form of sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, which [were] not * * * solicited or desired by the plaintiff, and which [were] viewed as undesirable or offensive'; (3) such harassment was based upon the plaintiff's sex; (4) such 'harassment makes continued tenancy burdensome and significantly less desirable than if the harassment were not occurring' and (5) '[i]f vicarious liability is asserted, the plaintiff must show that the owner knew or should have known about the particular harassment and [yet] failed to remediate the situation promptly.' " 302 Ill. App. 3d at 540 (quoting *Shellhammer v. Lewallen*, Fair Housing-Fair Lending Rptr. ¶ 15,472 at 16,128 (W.D. Ohio 1983) (*aff'd*, 770 F.2d 167 (6th Cir. 1985)).

¶ 30   With respect to a *quid pro quo* sexual harassment claim, our court adopted the following five elements: (1) that the complainant is a member of a protected group; (2) complainant was subjected to a demand for sexual favors, which were not solicited or directed by her; (3) the request was based on the complainant's sex; (4) the complainant's reaction to the request affected one or more tangible terms, conditions, or privileges of tenancy, in that she was denied or deprived of

tenancy or a substantial benefit thereof as a result of her response to the demand for sexual favors; and (5) if vicarious liability is asserted, complainant must show that the owner knew or should have known about the harassment and failed to remediate the situation promptly. *Id.* at 540-41 (adopting elements of a *quid pro quo* sexual harassment claim identified in *Shellhammer v. Lewallen*, Fair Housing-Fair Lending Rptr. ¶ 15,472, (W.D. Ohio 1983) (*aff'd*, 770 F.2d 167 (6th Cir. 1985)).

¶ 31    With these elements in mind, we find that the Commission did not abuse its discretion, in sustaining the dismissal with respect to Payne's claim for sexual harassment, under Count A of the Complaint.[3] First, the record supports the Commission's conclusion that Payne "did not establish that she was subjected to a demand for sexual favors." As noted by the Commission, Payne and Cermon gave conflicting statements; Cermon denied that they ever had a conversation that turned sexual. In any case, there was no evidence in the investigative report suggesting that Cermon ever demanded sexual favors; at most, Payne alleged that Cermon talked about his prior sexual encounters in her presence. The lack of evidence of a "demand for sexual favors" precluded Payne from establishing the first element of a *quid pro quo* sexual harassment claim. *Szkoda*, 302 Ill. App. 3d at 540-51; see also *Cavalieri-Conway v. L. Butterman & Associates*, 992 F. Supp. 995, (N.D. Ill. 1998) (discussing claim for sexual harassment under Fair Housing Act and explaining that the *quid pro quo* theory "applies only when a defendant demands sexual favors in exchange for favorable treatment.").

---

[3] We note that the Complaint did not specify whether petitioner intended to assert a *quid pro quo* or hostile environment sexual harassment claim.  Further, we recognize that the Commission's decision only discussed the elements of a *quid pro quo* claim. Nonetheless, under either theory, we cannot find error.

¶ 32     Furthermore, the Commission reasonably found that there was inadequate evidence to demonstrate an independent element of Payne's sexual harassment claim, *i.e.*, that her reaction to any sexual demand had "affected one or more tangible terms, conditions, or privileges of the tenancy." *Szkoda*, 302 Ill. App. 3d at 540-51. The Commission's conclusion was not arbitrary or capricious, given the lack of evidence that the increase in Payne's rent resulted from her response to Cermon's alleged harassment. To the contrary, the investigation reflected that Ledic compromised with Payne to reduce the amount of the rent increase. Ledic provided emails indicating that, after Ledic proposed a rent increase from $625 to $700, Payne asked for, and Ledic agreed to, a smaller reduction to $675 per month. Further undermining Payne's claim that she was specifically targeted for a rent increase, Ledic provided comparative data showing that 12 other one-bedroom units in the same building paid $675 or more in rent. Finally, Ledic's statement to the investigator that he told Cermon to stay away from Payne after she complained supported the Commissioner's conclusion that "Pro Invest took remedial actions." That evidence undermined Payne's attempt to show that respondents knew about the alleged harassment yet "failed to remediate the situation promptly." *Szkoda*, 302 Ill. App. 3d at 541.  For these reasons, we cannot say that the Commission was arbitrary or capricious in determining that there was insufficient evidence to establish a *prima facie* showing of a *quid pro quo* sexual harassment claim.

¶ 33     We note that Payne's complaint did not specify whether she additionally intended to assert a "hostile housing environment" sexual harassment claim.  In any event, the same evidence and findings already discussed would preclude such a claim. To support a hostile housing environment claim, Payne would need to establish that she was "subject to unwelcome and extensive sexual harassment, in the form of sexual advances, requests for sexual favors, and other verbal or physical

conduct of a sexual nature." *Szkoda*, 302 Ill. App. 3d at 540. As discussed, the Department's investigation did not find evidence of extensive or repeated instances of sexual harassment, or any request for sexual favors. Thus, the Commission's findings with respect to her *quid pro quo* sexual harassment claim would similarly support dismissal of Payne's charge, to the extent alleged a hostile housing environment claim.

¶ 34 Finding no error with respect to the Commission's dismissal of the sexual harassment claim (Count A), we turn to the retaliation claim (Count B). That claim essentially alleged that Payne's rent was increased in retaliation for her complaints about sexual harassment. Causation is a necessary element of a retaliation claim. See *Welch v. Hoeh*, 314 Ill. App. 3d 1027, 1035 (2000) (in the employment context, "[a] *prima facie* case of retaliation is established by showing that (1) the petitioner engaged in a protected activity; (2) the employer committed an adverse act against the petitioner; and (3) a causal connection existed between the protected activity and the adverse act."); see also *Michael v. Precision Alliance Group, LLC*, 2014 IL 117376, ¶ 31 (in retaliatory discharge cases, "[t]he requirement that the discharge be in retaliation for plaintiff's activities requires that a plaintiff establish a causal relationship between the employee's activities and the discharge. [Citation]").

¶ 35 In this case, the Commission found that the evidence was insufficient to establish any causal connection between Payne's complaint about harassment and the alleged retaliatory act (the rental increase). We cannot say that this conclusion was arbitrary or capricious, or that the Commission's explanation was unreasonable. To the contrary, the Commission's decision was supported by the evidence. First, as noted by the Commission, several months passed between Payne's complaint about alleged harassment in June 2015 and the rent increase in November 2015.

The Commission could reasonably conclude that this length of time weighed against finding a causal connection between the two events. See *Maye v. Human Rights Comm'n*, 224 Ill. App. 3d 353, 362 (1991) (in employment context, "[a] *prima facie* case of retaliatory discharge can be established by showing a short span between the time a competent employee filed a discrimination charge and the time of the employer's adverse action.") Further, the Commission could reasonably rely on the evidence that several other tenants were charged the same or higher monthly rent than Payne's rent. The Commission rationally concluded that this evidence undermined her contention that her rent was increased for a retaliatory purpose. That conclusion was also supported by the evidence that Ledic agreed to Payne's request to limit her rental increase, such that her monthly rent was $675 instead of $700. Based on the foregoing, the Commission did not abuse its discretion in finding insufficient evidence to support the claim of retaliation in Count B.

¶ 36 For the above reasons, we conclude that the Commission did not abuse its discretion in sustaining the dismissal of Payne's charge.

¶ 37 Affirmed.