NOTICE
Decision filed 12/02/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 200289-U

NO. 5-20-0289

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| JUNIOR WARREN, | ) | Petition for Direct Review |
| | ) | of an Order of the Illinois |
| Petitioner, | ) | Human Rights Commission. |
| | ) | |
| v. | ) | Charge No. 2014SH2335 |
| | ) | |
| THE ILLINOIS HUMAN RIGHTS COMMISSION, THE | ) | |
| ILLINOIS DEPARTMENT OF HUMAN RIGHTS, and | ) | |
| ERRION FREEMAN, | ) | Honorable |
| | ) | Michael R. Robinson, |
| Respondents. | ) | Administrative Law Judge. |

_____

JUSTICE MOORE delivered the judgment of the court.
Presiding Justice Boie and Justice Barberis concurred in the judgment.

**ORDER**

¶ 1     *Held*: The finding of the Illinois Human Rights Commission that the petitioner subjected the respondent to *quid pro quo* and hostile environment sexual harassment in connection with a rental housing transaction in violation of section 3-102(B) of the Illinois Human Rights Act (775 ILCS 5/3-102(B) (West 2012)) was not against the manifest weight of the evidence or clearly erroneous, the Commission did not abuse its discretion in declining to apply the nullity rule to void the proceedings based on the respondent's attorney's failure to seek *pro hac vice* admission prior to representing the respondent before the Commission, the Commission did not err in overruling the administrative law judge's recommended order and decision despite the Illinois Department of Human Rights' failure to file timely exceptions to that decision where the respondent obtained an extension of time to file her own exceptions, and there was adequate evidence in the record to support the Commission's award of emotional distress damages to the respondent.

¶ 2     The petitioner, Junior Warren, petitions this court, pursuant to Illinois Supreme Court Rule

335 (eff. July 1, 2017) for direct review of the May 19, 2020, order of the Illinois Human Rights

1

Commission (Commission), which directed Mr. Warren to pay $20,000 in damages to the respondent, Errion Freeman, as well as a civil penalty of $7500 to the Illinois Department of Human Rights (Department), for Mr. Warren's sexual harassment of Ms. Freeman. For the following reasons, we affirm the Commission's decision.

¶ 3                                    I. BACKGROUND

¶ 4      On December 30, 2015, in accordance with the provisions of the Illinois Human Rights Act (Act) (775 ILCS 5/1-101 *et seq.* (West 2012)), the Department filed a complaint with the Commission on behalf of Ms. Freeman. According to count I of the complaint, Ms. Freeman leased an apartment from Mr. Warren in East St. Louis, and from March 2013 through August 12, 2013, Mr. Warren sexually harassed Ms. Freeman, thus subjecting her to unequal terms and conditions of a rental transaction in violation of section 3-102(B) of the Act (*id.* § 3-102(B)). In count II of the complaint, the Department alleged that Mr. Warren subjected Ms. Freeman to unequal terms and conditions of a rental transaction in retaliation for opposing unlawful sexual harassment, in violation of section 6-101(A) of the Act (*id.* § 6-101(A)). The complaint sought damages on behalf of Ms. Freeman, a cease-and-desist order, attorney fees, and a civil penalty. Attached to the complaint was Ms. Freeman's housing discrimination complaint with the Department, which was prepared with the assistance of Kalila J. Jackson of the Metropolitan Saint Louis Equal Housing & Opportunity Council (EHOC).

¶ 5      A public hearing before the Honorable Michael R. Robinson, Administrative Law Judge (ALJ), took place on November 15, 2016.[1] Ms. Jackson represented Ms. Freeman during the proceedings, along with staff attorneys from the Department. Ms. Freeman testified that she is 24

---

[1]The complaint involving Ms. Freeman was consolidated for purposes of the public hearing with one involving another woman with similar allegations against Mr. Warren. However, those charges are not a subject of this appeal, and we will not discuss those aspects of the proceedings.

years old and has two children, one who is five years old and another who is one month old. She rented her first apartment from Mr. Warren on March 4, 2013, when she was 20 years old and had one child. She saw a "For Rent" sign in the window of the home, called the number, and spoke to Mr. Warren. At the time she viewed the apartment, Mr. Warren asked her if she had any children and if she had "a man." She told him she had no boyfriend but did have her one-year-old son. She was able to move into the apartment that day by paying $350 rent for the first month, along with a $350 deposit, with rent due on the fourth of each month.

¶ 6       Ms. Freeman testified that according to her lease, she was responsible for utilities, but when she moved in, the electric and gas were on in the apartment in Mr. Warren's name. According to Ms. Freeman, she was unable to move the electric and gas to her own name when she moved in because she had a past due balance with Ameren from when she lived with her grandmother through December 2012. She was able to pay the past due balance with Ameren on March 28, 2013, but between March 4, 2013, and March 28, 2013, the utilities remained in Mr. Warren's name. She testified that he agreed to give her a couple weeks to pay the past due balance and transfer the utilities. Two weeks after she moved in, Mr. Warren started asking her about when she would pay the bill. At that time, he told her she could pay the bill "by cash or ass." Shortly thereafter, early in the morning, the lights turned off in the apartment. She went outside, and Mr. Warren was standing there. He told her that Ameren had just left and turned off the lights.

¶ 7       Ms. Freeman testified that she asked Mr. Warren what she could do to get the lights back on until she could pay her past due balance. He responded, "we're both grown, and we can work something out." She understood that Mr. Warren meant that she could have sex with him to get the lights turned back on. Because she had no money, it was cold outside, and she wanted heat for her son, she had sexual relations with Mr. Warren. He came to her apartment, the sex lasted 5 to

3

10 minutes, and as soon as he walked out, her lights came back on. Ms. Freeman later learned that there was a switch in the basement for the electricity to the apartment, and Ameren had not visited the property. On cross-examination, Ms. Freeman admitted she did not call Ameren to verify they were not the source of the interruption.

¶ 8    Ms. Freeman testified that, after the sexual encounter, Mr. Warren began coming by daily with sexual advances, which she refused. When she had male company at her apartment, he always asked her questions about it. He made comments to her such as, "Your butt looks big today," "I want to hit it from the back," "I want to see what that tongue ring will do," "You can have anything you want from me but you don't know how to act," and "If you don't do it, Baby Girl will," referring to another tenant in the building.

¶ 9    Ms. Freeman testified that she paid her rent in March, April, May, and June 2013. In June 2013, a male friend began visiting her at her apartment. Mr. Warren asked her who he was, and when she told him, he did not really say anything. However, Ms. Freeman "could sense an attitude," but Mr. Warren did slow down his advances around that time. At the end of June, her grandfather died and needed help with funeral expenses. She contacted Mr. Warren in advance of the July rent payment date, which was July 4, and let him know that she was not going to be able to pay the full amount of rent on time. On July 5, 2013, the sheriff served her with a five-day notice of eviction, which was admitted into evidence. The notice states that $0 in rent is due and was signed by Mr. Warren on June 27, 2013. Ms. Freeman expected to be able to pay the rent by July 9. She went to court with Land of Lincoln Legal Assistance representing her and agreed to a move-out date with no evictions on her record.

¶ 10    Ms. Freeman testified as to how her experience with Mr. Warren affected her. She testified that she will no longer rent from private owners. She looks at men in a different way and has

4

depression and guilt regarding the sexual encounter she had with Mr. Warren. On cross-examination, she testified that she did not visit any doctor for her depression because she could not afford the bills.

¶ 11    Mr. Warren testified that he is 56 years old, has been married to his wife for 15 years, and resides in Fairview Heights. He has owned the building at issue since 2001. Mr. Warren testified that the utilities in Ms. Freeman's apartment were never in his name, and he never had any conversations with her about her electric bill. He testified that he never had sex with Ms. Freeman and never offered to have sex with her in exchange for his payment of the utility bill. He testified that the utility boxes for the units in his building are on the outside of the building, and he has no ability to turn off the electricity in the apartments. Mr. Warren denied that he ever made any sexual comments or advances toward Ms. Freeman.

¶ 12    On cross-examination, Mr. Warren testified that the electric bill was not in his name at the time that Ms. Freeman moved into the unit, and that it must have not yet been turned off by the prior tenant. Ms. Freeman did tell him at some time that the power had been shut off, to which he responded that is her responsibility. He asks potential tenants whether they have a boyfriend to get an idea of what type of people will be visiting his building.

¶ 13    On April 6, 2018, the ALJ issued a recommended order and decision. In his findings of fact, the ALJ found that the relevant events described in Ms. Freeman's testimony occurred as she had described them. Nevertheless, in its conclusions of law, the ALJ found that Ms. Freeman failed to establish a *prima facie* case of *quid pro quo* sexual harassment under section 3-102(B) of the Act (775 ILCS 5/3-102(B) (West 2012)), as alleged in count I of the complaint, because Mr. Warren's request for sex in exchange for restoration of her power did not affect one or more terms, conditions, or privileges of her tenancy. In addition, the ALJ found that Ms. Freeman failed to

5

establish a *prima facie* case of either hostile environment sexual harassment or *quid pro quo* sexual harassment under section 3-102(B), because she failed to show that any sexual harassment she experienced from Mr. Warren was based on her gender. Moreover, the ALJ found that Ms. Freeman failed to establish a *prima facie* case of retaliation because she failed to establish that she made a qualifying "protest" of sexual harassment and questioned whether an alleged protest of sexual harassment in an article III housing setting is protected conduct under the anti-retaliation provisions of section 6-101(A) of the Act (*id.* § 6-101(A)). Finally, the ALJ found that Mr. Warren articulated a neutral, nondiscriminatory reason for seeking Ms. Freeman's eviction and she failed to prove by a preponderance of the evidence that Ms. Freeman's failure to pay rent was a pretext for Ms. Freeman's having protested sexual harassment. Accordingly, the ALJ recommended that the complaint be dismissed with prejudice.

¶ 14    On May 9, 2018, the Department filed its exceptions to the ALJ's recommended order and decision, as required by section 5300.920 of the Commission's rules. 56 Ill. Adm. Code, ch. XI, § 5300.920. On May 11, 2018, Ms. Freeman filed a motion for an extension of time to file her exceptions, pursuant to section 5300.940 of the Commission's rules. 56 Ill. Adm. Code, ch. XI, § 5300.940. On May 30, 2018, Ms. Freeman filed her exceptions, and on May 31, 2018, the Commission entered an order granting both the Department and Ms. Freeman an extension of time to file exceptions, setting forth a deadline of June 15, 2018, to file exceptions.

¶ 15    On April 29, 2019, the Commission entered an order adopting in part and reversing in part the ALJ's recommended order and decision. Regarding Ms. Freeman's claim of *quid pro quo* sexual harassment, the Commission disagreed that Mr. Warren's request for sex in exchange for restoration of Ms. Freeman's power did not affect one or more terms, conditions, or privileges of her tenancy. The Commission reasoned that although Ms. Freeman's lease provided that she was

6

responsible for establishing a utility account in her name and paying her monthly bill, pursuant to the implied warranty of habitability, and section 42-35 of the East St. Louis Code of Ordinances, Mr. Warren was responsible for ensuring that the apartment's utility equipment was functional. In addition, Illinois law prohibits a landlord from tampering with utility lines. 765 ILCS 735/1.4 (West 2018). Based on these principles, the Commission concluded that the provision of functioning utility equipment is a term, condition, or privilege of tenancy and Mr. Warren's demand for sex affected a term, condition, or privilege of the tenancy. Therefore, the Commission reversed the ALJ's recommended dismissal of Ms. Freeman's *quid pro quo* claim.

¶ 16    As to Ms. Freeman's hostile environment claim, the Commission disagreed with the ALJ's determination that Ms. Freeman was required to prove that tenants of another sex were not subjected to sexual harassment, as neither the federal courts nor the Commission have required proof of a comparator of the opposite sex to make a *prima facie* case of sexual harassment in either the employment or rental contexts. The Commission found that Ms. Freeman had successfully proven that she was subjected to hostile environment sexual harassment and reversed the ALJ's dismissal of that claim as well. However, the Commission declined to review the ALJ's determination regarding retaliation and accordingly affirmed that portion of the ALJ's recommended order and decision. The Commission remanded the *quid pro quo* and hostile environment claims to the ALJ for further proceedings on damages.

¶ 17    Upon remand, the ALJ entered an order requiring Ms. Freeman to file a petition for fees and costs associated with the representation of Ms. Freeman on the remanded claims. Ms. Freeman filed her petition for attorney fees on June 10, 2019. In Ms. Jackson's affidavit, which accompanied the petition, she disclosed that she was admitted to practice law in Missouri but did not state that she is admitted to practice law in Illinois. All the time sheets submitted were for work Ms. Jackson

7

performed in pursuing Ms. Freeman's claims. On June 17, 2019, the Commission's Deputy General Counsel sent correspondence to Ms. Jackson, informing her that, according to the Illinois Attorney Registration and Disciplinary Commission (ARDC), she is not licensed to practice law in Illinois and had not been admitted *pro hac vice* in this matter. The Commission required Ms. Jackson to provide a written response regarding her potential unauthorized practice of law by July 1, 2019. The Commission informed Ms. Jackson that, until she provided the Commission with proof of her authorization to practice law in Illinois, she was not permitted to appear before the Commission in this matter or any other matter. Further, the Commission advised Ms. Jackson that, if it did not receive her response by that date, the Commission would advise the ARDC and the Missouri Supreme Court's Office of Chief Disciplinary Counsel (OCDC) of her apparent unauthorized practice of law at the Commission.

¶ 18    On July 12, 2019, Ms. Jackson filed her response to the Commission's correspondence, in the form of an affidavit in which she averred as follows. At no time did she expressly represent to the Department or the Commission that she was personally licensed in Illinois. While working on this case, she was under the genuine belief that it was not necessary for her to seek *pro hac vice* admission before the matter in light of Supreme Court Rule 5.5(c) and (d) (eff. Jan. 1, 2016), because a duly licensed attorney in Illinois was actively engaged in the matter and supervising all of her work in this case and because federal law allows out-of-state attorney representation in administrative proceedings.[2] She sincerely apologized if this interpretation was in error and requested that the Commission grant her leave to retroactively submit a *pro hac vice* application.

---

[2]Illinois Supreme Court Rule 5.5(c) (eff. Jan. 1, 2016) provides that a lawyer admitted in another jurisdiction, and not disbarred or suspended from practice in any jurisdiction, may provide legal services on a temporary basis in this jurisdiction that, *inter alia*, are undertaken in association with a lawyer who is admitted to practice in this jurisdiction and who actively participates in the matter. Illinois Supreme Court 5.5(d) (eff. Jan. 1, 2016) provides for such lawyers to provide legal services through an office or other

¶ 19 Ms. Jackson was admitted to practice law by the Missouri Bar in 2009 and provided her "Certificate of Good Standing" from the Missouri Supreme Court as an exhibit to her affidavit. She has never been subject to any disciplinary action by the Missouri Supreme Court and has never been, to her knowledge, referred to the Missouri Supreme Court for any alleged unethical conduct. Since 2011, she has worked as a staff attorney at EHOC, a not-for-profit organization dedicated to the eradication of housing discrimination in the St. Louis metropolitan area. In August 2016, she was promoted to senior staff attorney at EHOC. Her practice is primarily devoted to representing clients in civil litigation relating to housing discrimination, public accommodation discrimination, and consumer rights issues. EHOC primarily operates in five counties in Missouri and three counties in Illinois.

¶ 20 Since 2008, EHOC has endeavored to have at least one staff attorney licensed in Illinois to manage its Illinois cases, which almost exclusively consists of administrative practice before the U.S. Department of Housing and Urban Development (HUD) and the Department for alleged fair housing violations under state or federal law. EHOC provides its legal services to the public at no charge. Ms. Jackson represented Ms. Freeman in these proceedings under the direct supervision of attorney Zachary Schmook until August 2017 and attorney Samuel Hoff Stragand from August 2017 throughout the remainder of the proceedings. Certificates of good standing from the Illinois Supreme Court for both attorneys were attached as an exhibit to the affidavit. Ms. Jackson and Mr. Schmook determined that Ms. Jackson would not be required to be admitted *pro hac vice* in the proceedings before the Commission because she would be under the active supervision of Mr. Schmook, and later, Mr. Stragand. Both attorneys entered their appearance in these proceedings.

---

systematic and continuous presence in Illinois that, *inter alia*, are services that the lawyer is authorized by federal or other law or rule to provide in this jurisdiction.

¶ 21    On July 19, 2019, Mr. Warren filed a motion to dismiss the complaint against him on the basis that Ms. Jackson was not admitted to practice law in Illinois. According to Mr. Warren's motion, "any legal proceeding in which a person is represented by a person not entitled to practice law in Illinois is a nullity." On October 3, 2019, the ALJ issued a supplemental recommended order and decision. The ALJ found that dismissal of the complaint is warranted due to Ms. Jackson's unauthorized practice of law in the proceedings and recommended that the complaint be dismissed with prejudice. Alternatively, the ALJ found that $20,000 "is a fair assessment as to the emotional damages that [Ms. Freeman] experienced arising out of this case."

¶ 22    On November 7, 2019, the Department filed its exceptions to the ALJ's supplemental recommended order and decision. On November 14, 2019, Ms. Freeman, by and through Mr. Stragand of the EHOC, sought an extension of time to file her exceptions to the ALJ's supplemental recommended order and decision. On November 27, 2019, Ms. Freeman, by and through Mr. Stragand, filed her exceptions, along with several exhibits. In her exceptions, Ms. Freeman argued that the ALJ erred in applying the nullity rule in recommending that her complaint be dismissed. She provided proof, by exhibit, to show that both ARDC and OCDC expressly acknowledged that Ms. Jackson made a good faith effort to ensure her appearance was authorized, and that any alleged misinterpretation or misunderstanding did not constitute misconduct. Further, the exceptions highlighted the fact that, unlike court proceedings, the pleadings in this case were filed by the Department, rather than by Ms. Freeman through Ms. Jackson, and the Department was properly represented by Illinois attorneys. See 775 ILCS 5/8B-102(H)(1) (West 2018) ("The Department and the respondent shall be parties in hearings under this Article.").

¶ 23    On December 2, 2019, Mr. Warren filed a motion to dismiss the Department's exceptions to the ALJ's supplemental recommended order and decision, on the basis that they were filed more

than 30 days after the date of the decision and were therefore untimely as per section 5300.910 of the Commission's rules and regulations (56 Ill. Adm. Code, ch. XI, § 5300.910). In response, the Department pointed out that section 5300.910 requires that the exceptions be filed within 30 days after service of the decision, which it claimed occurred on October 8, 2019, making its November 7, 2019, exceptions timely. The Department provided the affidavit of an office associate at the Department to attest to this fact. On December 3, 2019, Ms. Freeman refiled her exceptions, for reasons unknown to this court. On December 17, 2019, the Commission entered an order recognizing the timeliness of Ms. Freeman's motion for an extension of time to file her exceptions, and granting the motion, giving Ms. Freeman until January 6, 2020, to file her exceptions.

¶ 24    On May 19, 2020, the Commission entered an order and decision, in which it granted Mr. Warren's motion to dismiss the Department's exceptions as untimely. However, based on Ms. Freeman's exceptions, the Commission reversed the ALJ's recommended order and decision with respect to the dismissal of Ms. Freeman's claims pursuant to the nullity rule. In so doing, the Commission emphasized three major differences between the instant case and cases applying the nullity rule: (1) Ms. Freeman's complaint was filed by an Illinois-licensed attorney with the Department, (2) an attorney with the Department was present throughout the proceedings, and (3) the nonlicensed attorney represented Ms. Freeman throughout the entirety of the proceedings. While the Commission acknowledged that Ms. Jackson's representation of Ms. Freeman without receiving *pro hac vice* admission was troubling, it found that Ms. Jackson's failure to attain such an admission "is more akin to a technical licensing requirement," and "is distinguishable from a situation where the representative has either failed to obtain a law license, has obtained a license through fraudulent means, or has had her license revoked for reasons to do with her competency as an attorney." Nevertheless, the Commission declined to award any attorney fees to EHOC.

11

¶ 25    Having found that Ms. Freeman's complaint should not be dismissed, the Commission ordered Mr. Warren to pay $20,000 in damages to Ms. Freeman, as recommended by the ALJ, and a civil penalty of $7500. On June 19, 2020, Mr. Warren filed a petition for rehearing before the Commission, which the Commission denied on August 19, 2020. On September 18, 2020, Mr. Warren filed a petition for direct review of the Commission's decision in this court, pursuant to Illinois Supreme Court Rule 335 (eff. July 1, 2017).

¶ 26                                    II. ANALYSIS

¶ 27    On appeal, Mr. Warren raises five issues, which we restate in the order in which we will address them: (1) whether the Commission erred in refusing to apply the nullity rule to dismiss Ms. Freeman's complaint; (2) whether the Commission erred in denying Mr. Warren's motion to dismiss the complaint based on the Department's failure to file timely exceptions to the ALJ's supplemental recommended order and decision; (3) whether the Commission's finding that Mr. Warren engaged in sexual harassment against Ms. Freeman was proper; (4) whether the Commission erred in finding that Ms. Freeman was not required to submit proof that Mr. Warren did not make unwanted sexual advances toward male tenants in order to make a *prima facie* case of sexual harassment; and (5) whether the Commission erred in awarding damages to Ms. Freeman where the ALJ did not conduct a hearing on damages following the Commission's April 29, 2019, decision.

¶ 28                                A. *The Nullity Rule*

¶ 29    We begin by addressing Mr. Warren's argument that the Commission erred in refusing to apply the nullity rule to dismiss the complaint in this case. Where a person who is not licensed to practice law in Illinois attempts to represent another party in legal proceedings, the nullity rule permits dismissal of the cause, thereby treating the actions taken by that party as a nullity.

*Applebaum v. Rush University Medical Center*, 231 Ill. 2d 429, 435 (2008). Our supreme court has held that the nullity rule is not a rule of subject matter jurisdiction, but rather, concerns the conduct of cases and the orderly administration of justice. *Downtown Disposal Services, Inc. v. City of Chicago*, 2012 IL 112040, ¶ 29. In addition, the nullity rule is not automatic but rather, the circuit court, or in this case, the Commission, should consider the circumstances of the case and the facts before it in determining whether dismissal is proper. *Id.* ¶ 30. Factors to be considered in making this determination include, *inter alia*: (1) whether the nonattorney's conduct is done without knowledge that the action was improper, (2) whether the party acted diligently in correcting the mistake by obtaining counsel, (3) whether the nonattorney's participation was minimal, and (4) whether the participation resulted in prejudice to the opposing party. *Id.* ¶ 31. Because the consequences of applying the nullity rule can be harsh, it should be invoked only where it fulfills the purposes of protecting the integrity of the court system from the actions of the unlicensed, and where no other alternative remedy is possible. *Id.* ¶ 30.

¶ 30    Interestingly, the cases do not set forth the standard of review to be applied in reviewing a circuit court's decision as to whether to apply the nullity rule. Regardless, our standard of review of the Commission's decision would likely differ, as it is well established that the standard of review of an administrative agency's decision depends upon whether the question presented is one of fact, of law, or a mixed question. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204-05 (1998). We find the nullity rule cannot be characterized as involving a question of law, because it requires the Commission to weigh the various factors to determine whether the nullity rule should apply to require dismissal of a complaint.[3] Thus, because an application of the

---

[3]Although we find that the clearly erroneous standard of review, rather than a *de novo* standard, applies to the Commission's decision to decline to apply the nullity rule, we note that our decision would be the same regardless of which standard of review we applied under the facts of this case.

13

nullity rule requires an examination of the legal effect of a given set of facts, we apply the clearly erroneous standard to review the Commission's decision to allow the Department's complaint on behalf of Ms. Freeman to stand. *Id.* Accordingly, we will only reverse the Commission's decision if we, on the entire record, are left with a definite and firm conviction that a mistake has been committed. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001).

¶ 31     In our view, the Commission's decision not to apply the nullity rule to dismiss the complaint the Department brought on behalf of Ms. Freeman, based on the well-articulated reasoning set forth in the Commission's May 19, 2020, order and decision, is not clearly erroneous. As explained by the Commission, it was proper to look at factors other than those articulated in *Downtown Disposal*, as that case addressed the narrower question of whether a claim instituted by a nonattorney on behalf of a corporation must be dismissed at a nullity. Here, the Commission was called upon to determine what the consequences should be when an attorney not licensed to practice in Illinois represents a client at an administrative hearing, where the complaint was initiated by the Department and its Illinois-licensed attorneys acted alongside the out-of-state attorney throughout the proceedings. Citing *Applebaum*, the Commission found Ms. Jackson's failure to seek *pro hac vice* status pursuant to Illinois Supreme Court Rule 707 (eff. Feb. 1, 2018) is more akin to a technical licensing requirement and did not necessarily render Ms. Jackson unqualified to represent Ms. Freeman. See *Applebaum*, 231 Ill. 2d at 443 ("a technical defect in the registration status of a duly licensed attorney [is] distinguishable from a situation where the representative has either failed to obtain a law license, has obtained a license through fraudulent means, or has had his license revoked for reasons to do with his competency as an attorney" (internal quotation marks omitted)). We agree with the Commission that the nullification of the

14

proceedings brought on behalf of Ms. Freeman based on Ms. Jackson's representation of her is not necessary to protect the integrity of these proceedings, and thus affirm the Commission's decision to deny Mr. Warren's motion to dismiss.

¶ 32                     B. *Timeliness of Department's Exceptions*

¶ 33     We next address Mr. Warren's argument that the ALJ's supplemental recommended decision should have become the final order of the Commission after the Department's exceptions were dismissed as untimely. Because this issue presents a question of law, our standard of review is *de novo*. *Medponics Illinois, LLC v. Department of Agriculture*, 2021 IL 125443, ¶ 29. We agree with the Commission that its dismissal of the Department's exceptions did not preclude the Commission's review of the ALJ's supplemental recommended decision based on Ms. Freeman's timely filed exceptions. See 56 Ill. Adm. Code § 5300.910 (if *no* timely exceptions to the recommended order and decision are filed, then the recommended decision will become the order of the Commission, without further review). Here, Ms. Freeman timely filed her exceptions, which triggered the Commission's jurisdiction to review the ALJ's supplemental recommended order and decision. Thus, the Commission did not err in reviewing the decision based on Ms. Freeman's exceptions.

¶ 34                     C. *Commission's Findings Regarding Sexual Harassment*

¶ 35     Mr. Warren argues that the Commission's findings that he committed sexual harassment against Ms. Freeman in violation of section 3-102(B) of the Act (775 ILCS 5/3-102(B) (West 2012)) are against the manifest weight of the evidence. The Department argues that the applicable standard of review is the more deferential clearly erroneous standard. We need not resolve this conflict regarding the standard of review because, under either standard, we cannot disturb the findings of the Commission.

15

¶ 36    Our courts have held that, to show proof of actionable sexual harassment under section 3-102(B) of the Act (*id.*), the same elements are required as under federal law, which are set forth in section 3604(b) of the Fair Housing Amendments Act of 1988 (42 U.S.C. § 3604(b) (1994)). *Szkoda v. Human Rights Comm'n*, 302 Ill. App. 3d 532, 539-40 (1998). Thus, just as in employment-related sexual harassment actions, sexual harassment in the housing context may be established by demonstrating a "hostile environment" or that benefits were explicitly or implicitly conditioned upon sexual favors (*quid pro quo*). *Id.* at 540. Here, the Commission found that Mr. Warren engaged in both types of sexual harassment against Ms. Freeman, and we will examine each in turn to determine whether the Commission's findings were in error.[4]

¶ 37                    1. *Hostile Housing Environment Sexual Harassment*

¶ 38    The elements of a hostile housing environment sexual harassment claim are: (1) the complainant is a member of a protected group; (2) the complainant was "subjected to unwelcome and extensive sexual harassment, in the form of sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature, which [were] not *** solicited or desired by the [complainant], and which [were] viewed as undesirable or offensive"; (3) such harassment was based on the complainant's sex; and (4) such "harassment makes continued tenancy burdensome and significantly less desirable than if the harassment were not occurring." (Internal quotation marks omitted.) *Id.* (quoting *Shellhamer v. Lewallen*, Fair Housing-Fair Lending Rptr. ¶ 15,472, at 16,128). In his brief on appeal, Mr. Warren makes no argument that these elements were not set forth by the evidence other than questioning Ms. Freeman's credibility and arguing that Mr.

_____

[4]We note that Mr. Warren cites several cases in his brief that address the Department's claim that Mr. Warren retaliated against Ms. Freeman for resisting his sexual harassment of her by evicting her. However, the Commission sustained the ALJ's dismissal of this charge in the complaint. Accordingly, these cases are inapposite to the Department's claim that Mr. Warren engaged in hostile environment and *quid pro quo* sexual harassment against Ms. Freeman.

Warren's advances were not unwanted because on the occasion when her lights were cut off and Mr. Warren told Ms. Freeman "she knew what she had to do," Ms. Freeman "willingly solicited sex between herself and Junior Warren." We find Mr. Warren's argument to be outrageous. There is evidence in the record by which the Commission could conclude that Mr. Warren made numerous sexual advances toward Ms. Freeman, both before and after the "electricity incident," which were unwanted by Ms. Freeman, and which she refused. Ms. Freeman testified that Mr. Warren told her he could pay the bill "by cash or ass" two weeks before he disconnected the power to her apartment. In the days and weeks after Mr. Warren disconnected the electricity, he made comments to her such as, "Your butt looks big today," "I want to hit it from the back," "I want to see what that tongue ring will do," "You can have anything you want from me but you don't know how to act," and "If you don't do it, Baby Girl will," referring to another tenant in the building. Although Mr. Warren testified that he never made sexual advances or comments to Ms. Freeman, it was the Commission's province to determine credibility, and pursuant to section 3-102 of the Administrative Review Law (735 ILCS 5/3-102 (West 2020)) the Commission's findings and conclusions on questions of fact are to be deemed *prima facie* true and correct. Accordingly, we decline to disturb the Commission's finding that Mr. Warren subjected Ms. Freeman to hostile environment sexual harassment in violation of section 3-102(B) of the Act. 775 ILCS 5/3-102(B) (West 2012).

¶ 39                    2. *Quid Pro Quo Sexual Harassment*

¶ 40    Based on the complainant's allegations here, there are four elements necessary to prove *quid pro quo* sexual harassment under section 3-102(B) of the Act (*id.*): (1) the complainant is a member of a protected group; (2) the complainant was subjected to "[a] demand for sexual favors, which [were] not *** solicited or desired by the tenant (or prospective tenant)"; (3) that such a

17

request was based on the complainant's sex; and (4) "the [complainant's] reaction to the request affected one or more tangible terms, conditions, or privileges of tenancy, in that she was denied or deprived of tenancy or a substantial benefit thereof as a result of her response to the landlord's demand for sexual favors." (Internal quotation marks omitted.) *Szkoda*, 302 Ill. App. 3d at 540-41 (quoting Fair Housing-Fair Lending Rptr. ¶ 15,472, at 16,129). Here, the Commission found that after Ms. Freeman refused Mr. Warren's suggestions that she pay for the electric bill with "cash or ass," Mr. Warren unplugged the electricity from Ms. Freeman's apartment. The fact that Ms. Freeman succumbed to Mr. Warren's demands by later contacting him to arrange for the intercourse that Mr. Warren had clearly stated would serve to have the electricity restored does not negate the elements set forth above. While Mr. Warren argues that he was under no obligation to provide electrical service as part of the lease, we agree with the Commission that Mr. Warren's interference with the equipment that provided the electricity to the apartment to make Ms. Freeman think that Ameren had shut her power off, was sufficient to show an effect on the terms, conditions, and privileges of her tenancy. For these reasons, we will not disturb the Commission's finding of *quid pro quo* sexual harassment.

¶ 41                    D. *Proof of a Comparator*

¶ 42    Mr. Warren argues that the circuit court erred in not requiring proof of a male comparator who was treated more favorably than her to establish her sexual harassment claim. Again, Mr. Warren raises a question of law, which we review *de novo*. *Medponics Illinois, LLC*, 2021 IL 125443, ¶ 29. We agree with the Department that this is not a requirement under Illinois law, and Mr. Warren does not cite to any Illinois case that imposes such a requirement. Further, the U.S. Supreme Court case that Mr. Warren cites is completely inapposite, as that case dealt with the issue of whether a comparator would be required to prove same-sex sexual harassment in a mixed-

18

sex workplace. See *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998). In addition, the U.S. Supreme Court did not find that such a comparator would be required to prove sexual harassment in a case, such as this one, where the challenged conduct involves explicit or implicit proposals of sexual activity. *Id.*

¶ 43                              E. *Hearing on Damages*

¶ 44    Finally, Mr. Warren argues that the Commission erred "when it did not conduct a hearing on damages as ordered by its April 29, 2019, decision." However, we agree with Ms. Freeman that the April 29, 2019, decision reversed the ALJ's dismissal of Ms. Freeman's claims and remanded the case to the ALJ "for further proceedings on damages." Upon remand, the ALJ ordered further submissions from the parties on attorney fees, and in its supplemental order and decision, calculated Ms. Freeman's damages at $20,000 as a noneconomic award for Ms. Freeman's emotional distress. We agree with Ms. Freeman that the ALJ did not conduct a further evidentiary hearing on damages because Ms. Freeman testified regarding the nature of her damages during the prior hearing. While Mr. Warren makes an argument in his brief that Ms. Freeman's testimony regarding her emotional distress was inadequate to justify the award, he cites no case law in support of his position that medical evidence of emotional distress is required for such an award. Thus, Mr. Warren has forfeited this argument on appeal. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (argument shall contain citation to the authorities relied on and points not argued are forfeited). Forfeiture aside, we uphold the Commission's assessment of Ms. Freeman's emotional distress damages considering Ms. Freeman's testimony that she felt depressed, worthless, and "like an object for sale." We would not substitute our judgment for that of the Commission as to the monetary value of these damages, and so decline to disturb the award.

¶ 45                           III. CONCLUSION

¶ 46     For the foregoing reasons, we affirm the Commission's May 19, 2020, order, which directed Mr. Warren to pay $20,000 in damages to Ms. Freeman, as well as a civil penalty of $7500 to the Department, for Mr. Warren's sexual harassment of Ms. Freeman.

¶ 47     Affirmed.